(No. 747—Claim denied.)

ALFRED W. MAYFIELD, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed September 14, 1926.*

*Rehearing denied November 9, 1926.*

QUARANTINE—*right of State to destroy animals infected with contagious disease.* The State has the right and power to order the destruction of animals infected with contagious disease, if public interest is best served thereby.

SAME—*when State not liable.* Where animals are quarantined or killed for the purpose of eradicating a dangerous or infectious disease, the State is not liable to compensate the owner for the loss suffered thereby, in the absence of a statute providing therefor. (*Durand* v. *Dyson*, 271 Ill. 382.)

SAME—*construction of Sec. 6, of Act of Gen. Assembly 1919, page 211. Tuberculosis among domestic animals.* By Section 6, of the Act of 1919, page 211, it was intended by the Legislature that compensation should only be paid for cattle destroyed by the joint action of the Federal and State departments, and only then when claimant complies with all the provisions of the quarantine regulations.

SAME—*State not liable for loss in sale of diseased animals.* The Act of 1919, makes no provision for the payment of losses incurred in the sale of diseased animals.

JESSE PEEBLES & W. EDGAR SAMPSON, for claimant.

OSCAR E. CARLSTROM, Attorney General; FRANK R. EAGLETON, Assistant Attorney General for respondent.

Mr. JUSTICE THOMAS delivered the opinion of the court.

This case is brought to recover the loss claimant sustained on the sale of 27 head of tubercular cattle. Claimant's state-

ment was filed November 16, 1923, and alleges in substance: that in the year 1922 he had a herd of 27 head of milk cattle; that it was brought to the attention of the Board of Live Stock Commissioners these cattle were the victims of a communicable disease and after an investigation of the cattle claimant's farm was strictly quarantined as provided by statute; that after said quarantine he was given permission, on March 30, 1922, by F. A. Laird, chief veterinarian of the State, to ship the cattle and sell them, and pursuant to such permission, on or about April 22, 1922, he shipped them to the Producers Live Stock Commission Association at the National Stock Yards; that the cattle were sold and the net proceeds of the sale, amounting to only $253.49, were remitted to him and represent all he received from the sale of the cattle; that before shipping the cattle for sale he caused the value of them to be appraised by competent and disinterested persons who valued 18 head of milk cows at $124.00 each and 9 head of heifers at $80 each; that the difference between the appraised value of the cattle and the price received from the sale of them is the basis of his claim; that because of such quarantine and direction by the State veterinarian he sold said 27 head of cattle; and that the value of the same over the sum of $253.49 was wholly lost to him. The Attorney General has filed a general demurrer to claimant's statement.

Evidence was taken on behalf of claimant and the State. It shows that a number of the farmers around Carlinville in the summer of 1921 decided to have their dairy herds tested for tuberculosis, and on September 3d claimant signed an agreement to have a test of his herd made. A test was made by Dr. Decker and 16 of his animals were found to be tubercular. On September 9th, these 16 cattle were quarantined and notice of quarantine delivered to claimant. The notice of quarantine contained the following provisions: "It shall be your duty to keep the quarantined animals confined in such manner that other cattle utilized for dairy or breeding purposes cannot come in contact with the same; at the time of disposing of said quarantined animals, notice of shipment or sale must be forwarded to the chief veterinarian on the day of shipment or sale. Blank form of said notice is hereto attached, and must be subscribed and sworn to before a notary public."

The agreement signed by claimant to have his herd tested contained the following clause: "I will allow no cattle to be

associated with my herd which have not passed a tuberculin test approved by the Bureau of State officials. I will keep all new cattle separated from my herd pending the application of a tuberculin test by an inspector of the said Bureau or State. I will notify the proper officials immediately, giving details of the identification, characteristics, and records of tuberculin tests of any cattle which may be added to my herd.''

The test of claimant's herd was made and his cattle quarantined under the provisions of the act entitled ''An act to revise the law in relation to the suppression and prevention of the spread of contagious and infectious diseases among domestic animals,'' approved June 14, 1909. Section 2 of this act makes it the duty of the Board of Live Stock Commissioners, the State Veterinarian, or any assistant State Veterinarian, to cause any animals infected with a dangerously contagious or infectious malady to be strictly quarantined.

It is now generally recognized that tuberculosis is a dangerous and contagious malady, and that human beings may contract it by the use of milk from tubercular cows, and under the provisions of the act of 1909 it was the duty of the State officials to quarantine claimant's herd. Cattle infected with such a disease become a public nuisance and the State has power to quarantine them and, if deemed necessary for the public good, to order their destruction. (*Durand* v. *Dyson*, 271 Ill. 382; *Thompson* v. *State*, 4 C. C. 26.) Some time after these cattle were quarantined complaint was made to Dr. Laird, Chief Veterinarian of the State, in regard to the manner in which claimant was caring for his herd, and Dr. Jackson R. Brown, an Assistant State Veterinarian, was sent to investigate. Dr. Brown made his investigation on December 22, 1921. Claimant had not kept his infected cattle separate from those not infected as the provisions of the quarantine required he should do, but allowed them to mingle together in his barn lot. Dr. Brown informed him this was a violation of the conditions of the quarantine and instructed claimant that he should keep the infected cattle isolated from the healthy ones. Claimant said he was unable to handle them any differently, and continued to allow them to mingle in his lot until the infected ones were disposed of. After this investigation was made by Dr. Brown, Dr. J. J. Littner, Inspector in charge of tuberculosis eradication work in the State of Illinois, notified claimant that as he had violated the

provisions of his cooperative agreement cooperation had been withdrawn by the State and Federal departments and they no longer assumed responsibility for tuberculosis eradication in connection with his herd. After this claimant decided he wanted to get rid of his diseased cattle in order to clean up his herd and on March 28, 1922, wrote to Dr. Laird relative to shipping the infected cattle to market. On March 30th, Dr. Laird replied, enclosing a permit to ship the cattle, and in his reply told claimant he had lost his indemnity on the animals. On April 13, 1922, the day before the shipment was made, claimant had his entire herd tested. This test was made by Dr. Hammond and showed 27 cows and heifers infected with tuberculosis. On the advice of Mr. Rusk, the Farm Advisor of Macoupin County, these infected cattle were shipped by claimant to the Producers Live Stock Commission Association for sale on April 14, 1922, and were sold by them for the account of claimant for the net sum of $253.49. The day before the cattle were shipped claimant states he had them appraised by John Campbell, Charley Moore, B. F. Burke and Harry C. Foltz. This appraisement was not made at the request nor under the direction of either the State or Federal Departments of Agriculture. It has not been introduced in evidence and the record does not disclose how it was made. Mr. Burke and Mr. Foltz were called as witnesses by claimant and testified the 18 cows were worth $125.00 per head and the heifers $50.00 per head. Claimant also called F. D. Gore to prove the value of the cattle and he testified the cows were worth $125.00 per head and the heifers $50.00 to $60.00 per head. Claimant asks to be awarded the difference between these proven values of the cattle and the net sum received by him from their sale.

Under its police powers the State has the right to place cattle infected with tuberculosis under quarantine, and to destroy them if deemed necessary to the public welfare, without compensation to the owner. *Durand* v. *Dyson, supra.* Where animals are quarantined or killed for the purpose of eradicating a dangerous and infectious disease the State is not liable to compensate the owner for the loss suffered thereby unless the statute provides for the payment of such loss by the State. And if the statute provides for payment of compensation to the owner, in order to recover it the owner must comply with the provisions of the statute relating thereto.

It is the contention of claimant that he is entitled to compensation under the provisions of the act entitled "An act in relation to the suppression, eradication and control of tuberculosis among domestic cattle and to provide an appropriation therefor", approved June 28, 1919.    Laws of 1919, p. 211.    Section 4 of this act provides that the Department of Agriculture, with the consent of the owner, may destroy cattle affected with tuberculosis if the public interests would best be served by their destruction.    Section 5 of the act provides that "subject to the provisions hereinafter set forth, the owner of any cattle destroyed under the provisions of this act shall be reimbursed for the loss thus sustained."    Section 6 is as follows: "If any cattle tested for tuberculosis under the provisions of this act shall react to the test, and the owner shall consent to the destruction thereof, such cattle shall be appraised by a board of appraisers, consisting of a representative of the United States Department of Agriculture and a representative of the Department of Agriculture of the State of Illinois.    In case of a failure to agree on the valuation, or if the owner refuses to accept the appraised value, the two appraisers, together with the owner, shall select a third appraiser agreeable to all.    The owner shall be bound by the appraisal.    The State of Illinois shall pay to the owner of cattle destroyed under the provisions of this act one-third of the difference between the appraised value of such cattle and the proceeds from the sale of the salvage, which the owner shall receive, provided that in no case shall any payment hereunder exceed $25.00 for any grade animal or $50.00 for any pure-bred animal, and no payment shall be made unless the owner has complied with all lawful quarantine regulations."    It is clear from the provisions of this section that the Legislature intended that compensation should be paid only for cattle destroyed by the joint action of officials of the Federal and State Departments of Agriculture, and that the amount of such compensation should be fixed by representatives of these two departments if they could agree with the owner, and if they could not so agree, by such representatives and a third person agreeable to them and the owner, and that in no event should compensation be paid to any owner who had not complied with all lawful quarantine regulations.    Claimant did not comply with the quarantine regulations.    These regulations required him "to keep the quarantined animals confined in such manner that other cattle

used for dairy or breeding purposes cannot come in contact with the same.'' This requirement was plainly stated in the notice of quarantine sent by the chief veterinarian to claimant. It was a reasonable and lawful regulation and one with which claimant should have complied. He did not do so and his explanation for not doing it is that he could not handle his cattle differently. Inconvenience is no excuse for his not complying with the quarantine regulations.

This statute expressly provides that ''no payment shall be made unless the owner has complied with all lawful quarantine regulations.'' This provision makes compliance with the quarantine regulations a condition precedent to the right of an owner to receive compensation. Claimant is charged with knowledge of the law. But aside from that he was notified by both the Federal and State officials that his failure to comply with the quarantine regulations would lose him any right to compensation. In December, 1921, Dr. Brown first called his attention to the regulations when he discovered the infected and healthy cattle were not being kept separate, and told him his failure to comply with them would lose him his right to indemnity. Claimant did not then isolate the infected cattle but continued to turn the infected and healthy animals out together in the barn lot until the infected ones were disposed of.

The Department of Agriculture did not order these cattle destroyed. It only placed them under quarantine and, at the request of claimant, permitted them to be shipped out for sale. It appears from all the provisions of this act that the Legislature intended to compensate owners only for cattle destroyed by order of the department. The act makes no provision for the payment of losses on the sale of diseased cattle. But even if the act could be construed to include such losses, claimant is barred from recovery by his failure and refusal to comply with the quarantine regulations.

The demurrer is sustained, the claim disallowed and cause dismissed.